827 So.2d 443 (2002)
LOUISIANA DEPARTMENT OF TRANSPORTATION & DEVELOPMENT, Plaintiff-Appellant,
v.
KANSAS CITY SOUTHERN, et al RAILWAY CO., Defendants-Appellees.
No. 36,002-CA.
Court of Appeal of Louisiana, Second Circuit.
August 8, 2002.
*444 Oats & Hudson, by WM. H. Hudson, III, Lawrence E. Marino, Lafayette, Lawrence A. Durant, James M. Bookter, Baton Rouge, for Appellant, Louisiana Department of Transportation & Development General Counsel.
Wilkinson, Carmody & Gilliam, by Bobby S. Gilliam, Shreveport, for Kansas City Southern Railway Co., Defendant-Appellee.
Fulbright & Jaworski, by Osborne J. Dykes, III, Rebecca J. Cole, David M. Goldberg, for Appellee, Crystal Gas Storage, Inc.
Cook, Yancey, King & Galloway, by Albert M. Hand, Jr., Shreveport, for Crystal Gas Storage, Inc.
John S. Stephens, for Appellee, Steel Erectors Plus.
Before NORRIS, STEWART and DREW, JJ.
DREW, J.
This appeal arose out of a dispute over the efforts of the State of Louisiana, Department of Transportation and Development (DOTD) to be paid by previous property owners for the costs of removal of allegedly hazardous material discovered during the construction of Interstate 49 in Shreveport. DOTD appealed the partial summary judgment[1] in favor of Crystal Gas Storage, Inc. (Crystal) and Kansas City Southern Railway Company (KCS) which had joined Crystal's motion for partial *445 summary judgment. Specifically, the trial court ruled that DOTD could not recover from the defendants any sums for which DOTD had received reimbursement from the federal government. The judgment of the trial court is affirmed.

BACKGROUND
The record, briefs and argument of counsel reveal the framework of this litigation. Congress recognized the national interest in building a nationwide set of highways using a single set of standards. Due to the massive costs, Congress chose to pay a large part of the costs for constructing the roads. Each year Congress appropriated billions of dollars to subsidize national highway construction. The Federal Highway Administration (FHWA) administered and apportioned those funds among Louisiana and the other states for construction of highway projects approved by FHWA. When a state and the FHWA signed a project agreement, the federal government became contractually obligated to pay the federal share of a project. As the work progressed, federal funds were disbursed to the states pursuant to appropriation vouchers. DOTD and FHWA executed a project agreement for the segment of Interstate 49 through Shreveport at Pierremont Road. Therefore, FHWA was obligated to pay the federal share of the costs of the project.

PLEADINGS, ARGUMENTS AND SUBMISSIONS RELATED TO MOTION FOR PARTIAL SUMMARY JUDGMENT

DOTD's Petition
In its second supplemental, amended and restated petition filed June 16, 2000, DOTD declared that it was the state agency charged with constructing and maintaining highways within Louisiana and, also, a political entity with capacity to sue and be sued. DOTD named these defendants: (1) KCS; (2) North Louisiana Goodwill Industries Rehabilitation Center, Inc. (Goodwill); (3) Steel Erectors, Inc. (Steel) and (4) Crystal. In addition, the insurance carriers for the defendants were made defendants.
DOTD based Crystal's liability on the following allegations: In 1926 a predecessor company owned the property upon which Caddo Oil & Refining Company had operated an oil refinery in 1911 which leaked hazardous material. Although the site was already contaminated at the time of Crystal's 1926 purchase, Crystal operated an oil refinery or barrel topping facility at which Crystal generated and disposed of additional hazardous material at the site. In 1935, Crystal sold the contaminated property to Eugene F. Griswold who, in turn, transferred the site to Griswold Refineries which in 1942 sold the property to M.L. Grogan whose heirs later owned the property. DOTD alleged that the City of Shreveport purchased a portion of the contaminated property from the Grogan heirs for the construction of a section of Pierremont Avenue. DOTD's petition detailed ownership history of other portions of the tract including that of Steel and Goodwill, all of which were alleged to have been contaminated by the actions of Crystal (or its predecessor companies) and/or KCS.
As to KCS, DOTD alleged that KCS's responsibility for the contamination arose out of a train derailment which occurred on March 31, 1966 at or near the property in question. At least eleven train cars caught fire, eight of which were completely destroyed. The contents of six cars were destroyed or disposed of at the scene. Allegedly, the train carried hazardous materials which were buried at or near the site, causing further contamination of the subject property.
*446 In its petition, DOTD further alleged this sequence of events: In September 1989, a DOTD highway construction contractor encountered multiple areas of contamination that appeared to be hazardous waste and/or hazardous substances. The Louisiana Department of Environmental Quality (DEQ) ordered DOTD to analyze the substances to determine if they were hazardous. On November 3, 1989, the contractor had to suspend I-49 construction at that site. DOTD alleged that the preliminary assessment of the site showed that there was an imminent endangerment to human health or the environment. Between January and June 1990, DOTD conducted a systematic investigation which indicated contamination. On instructions from DEQ, DOTD developed a systematic plan approved by DEQ for remediating the site and disposing of hazardous material. The contractor remediated the site and properly disposed of the hazardous waste between September and December 1990. DOTD stated that tens of thousands of cubic yards of overburden material were removed. Contaminated soil was removed from the ground, aerated and replaced into the embankment of the interstate while oily sludge and contaminated liquids were removed and hazardous portions properly eliminated. Further remediation was conducted when additional pockets of contamination were encountered after December 1990. In November 1991, DEQ inspected the property, found no further evidence of contamination, and issued a letter classifying the site as closed as of December 1991.
DOTD based its action on the Louisiana Environmental Quality Act (LEQA), La. R.S. 30:227, et seq.; La. R.S. 48:276; and the jurisprudence on indemnity. DOTD sought recovery of all costs incurred by DOTD as a result of the hazardous material remediation; actual, consequential and delay damages; costs of court including attorneys' and expert witnesses' fees; and interest from the date of judicial demand. Further, DOTD asked for a declaratory judgment that (1) DOTD had satisfied prerequisites to file suit under LEQA, (2) defendants were liable for the relief sought and (3) defendants were liable for any further remediation of any further contamination encountered at the site and on adjacent or nearby property.

DOTD's Motion in Limine
On March 12, 2001, DOTD filed a Motion in Limine in response to a defense allegation contained in Crystal's answer filed July 3, 2000, in response to DOTD's Second Supplemental, Amended and Restated Petition. Crystal's answer asserted that DOTD had no standing or other legal authority to recover the 90% damages for which DOTD has already been reimbursed by the federal government. Crystal based the defense upon the fact that the FHWA funded the remediation as it funded most of the cost of constructing I-49.
DOTD's Motion in Limine urged that the defendants were not justified in seeking entitlement to any credit for FHWA's participation in DOTD's remediation and that said participation was irrelevant to this case. Even if FHWA's participation was found relevant, DOTD argued that the probative value of the evidence would be substantially outweighed by the danger of jury confusion or prejudice to DOTD. Therefore, DOTD requested that evidence about FHWA's reimbursement be excluded from the trial.

DOTD's Memo Supporting Motion in Limine
Arguing in support of its Motion in Limine, DOTD urged that Crystal sought to obtain a windfall reduction of its liability. DOTD compared its relationship with FHWA to a "partnership" and asserted the following: FHWA provided the money *447 for the construction while DOTD signed the construction contracts. DOTD owned the highway and provided maintenance. Highway related claims were brought by DOTD which exercised any governmental rights concerning the highway.
DOTD's memo continued that after DOTD paid remediation costs to the contractors, FHWA (under the Project Agreement) reimbursed DOTD for the federal share of this project. Further, as DOTD's partner, FHWA agreed to reimburse DOTD 90% of the attorneys' fees incurred in connection with this effort to recover remediation costs. FHWA's reimbursement and agreement to share in the attorneys' fees represented FHWA's contribution to the partnership.
Attached to the memorandum supporting its Motion in Limine, DOTD filed the June 2, 1989 Federal Highway Administration Federal-Aid Project Agreement between FHWA and DOTD along with the September 27, 1988 FHWA Letter of Approval to DOTD. Issued by the division administrator of the FHWA, approved by the project engineer and bearing federal project number I-49-4(038)202 and state project number XXX-XX-XX, the 1988 Letter of Approval covered construction of .876 miles on I-49 including the Southern Avenue interchange for which the estimated cost was $16,258,300 of which 90% was to be paid by the FHWA. The Federal-Aid Project Agreement with the same project numbers gave a total estimated cost of $17,158,800.00 and had attached several sheets of "fine print" agreement provisions required by federal law.

Crystal's Fifth Motion for Partial Summary Judgment (MPSJ)
In its Fifth[2] Motion for Partial Summary Judgment, Crystal stated that DOTD sought to recover costs it did not incur, since the FHWA had reimbursed DOTD for 90% of the cost, or $1,101,744.00. Crystal asserted that DOTD's recovery of remediation costs previously paid to DOTD would violate the basic principle prohibiting "double dipping" and the prohibition against recovery of an amount more than plaintiff had been "impoverished."

Crystal's Memo Supporting its MPSJ
Crystal's supporting argument was that DOTD was seeking a double recovery. Crystal referenced DOTD's pleadings in its Second Supplemental and Restated Petition in which DOTD sought "recovery of all costs incurred by DOTD" as a result of remediation. DOTD also had alleged it was "a person who has incurred remedial costs" under the LEQA. As to indemnity, DOTD alleged it was "entitled to indemnity for all costs incurred by DOTD" under common law unjust enrichment principles.
According to Crystal, DOTD did not incur the costs of remediation indicated because 90% of the remediation costs were paid by FHWA to reimburse DOTD. Therefore, if DOTD recovered the total remediation costs, then DOTD would receive an impermissible double recovery. Crystal attached DOTD's answers to discovery in which DOTD acknowledged that FHWA paid 90% of the remediation costs and 90% of the attorney's fees to pursue this action.
Citing jurisprudence, Crystal asserted that Louisiana has a strong public policy against double-dipping or recovery of windfall damages. Also, for DOTD to recover the 90% would also violate common law indemnity rules. Crystal also argued *448 that alleged unjust enrichment of Crystal has no application, since DOTD has not been impoverished due to FHWA's paying 90% of the remediation costs. See C.C. art. 2298.[3] As to the 10% of the remediation costs paid by Louisiana, DOTD's action to recover that portion is not covered by this MPSJ.
Crystal disputed DOTD's reliance upon anti-trust jurisprudence for the proposition that states may recover joint federal/state funds. According to Crystal, those cases merely applied the long-standing "direct purchaser rule" unique to Clayton Act anti-trust cases which are inapplicable to this dispute.
In response to DOTD's reliance on the collateral source rule, Crystal urged that: (1) the collateral source rule, a tort-based concept with limited application, is irrelevant to this case; (2) the rule provides that a tortfeasor should not be able to benefit from the victim's foresight in purchasing insurance; (3) due to its windfall aspect, the application of the rule has been limited; (4) this is not a tort/personal injury situation, but is a cost recovery action by the state; (5) there is no "insurance or other benefits" involved so the collateral source rule is irrelevant and (5) other policy considerations (the collateral source rule promotes procurement of insurance, tort deterrence and accident preventions) are inapplicable.
As to DOTD's argument that the relationship between FHWA and DOTD was like a partnership, DOTD acknowledged in its opposition discussed below that the partnership analogy was incomplete.

DOTD's Opposition to Crystal's Fifth Motion for Summary Judgment
DOTD argued that Crystal was seeking a windfall reduction of its liability for the cost of remediating the contamination and that Crystal was not entitled to any credit for the contribution by FHWA for the costs of the clean-up. Specifically, DOTD argued that the FHWA payment of remediation costs was not a repayment to DOTD, but a payment pursuant to a joint federal/state venture. Citing anti-trust litigation and the collateral source rule (see later discussion), DOTD urged that the FHWA payment was not a windfall or a double recovery. In the alternative, DOTD asserted that FHWA had clearly authorized DOTD to act for FHWA to recover the federal portion of the clean-up costs. In support, DOTD attached: (1) "Interim Guidance For Hazardous Waste Site Affecting Highway Project Development," dated August 1988; (2) FHWA Letter dated 9/22/91 by Virginia I. Cherwek with Internal Memorandum; (3) FHWA Letter dated 2/7/94 to DOTD from Jean Rogers, Regional Counsel, FHWA; and (4) the July 17, 1997 letter from Wilbert Baccus, Associate Chief Counsel, FHWA. Provisions of these documents will be discussed later in the opinion.
In opposing the motion for summary judgment, DOTD attached portions of the deposition of John Oglesby, DOTD Construction Services Engineer in charge of *449 setting up and tracking federal and state funding for highway construction. Oglesby explained that DOTD personnel identified a need for and the scope of a particular highway construction project. In addition, DOTD drew up and submitted to FHWA a list of projects planned over the next three years.
For a particular proposed construction project, DOTD handled preliminary work including design, right-of-way acquisition, utility work, and environmental clearances. FHWA's involvement at that point was to review the work done. Thereafter, DOTD sought authorization from FHWA for that particular construction project; i.e., a request for FHWA to participate in funding the project. This particular project was fully reviewed by FHWA in 1988. Next DOTD obtained authorization in a "Letter of Approval and/or Authorization" which Oglesby described as the permission for DOTD to advertise the project. After receiving the sealed bids, DOTD reviewed the bids and, unless all bids were rejected, the low bid was determined and an award letter was sent out with requirements for the contractor to meet such as obtaining a bond. At that point in the process, FHWA issued an agreement committing to participate in the funding. With Oglesby's partial deposition, DOTD attached the Letter of Approval and/or Authorization and the Federal-Aid Project Agreement committing FHWA funds to the project to which Oglesby referred in the deposition.
After the Project Agreement, Oglesby stated DOTD prepared a Cost Distribution (CD), a spreadsheet of federal and state participation used to encumber the funds in the state treasury. Each year the Legislature's Capital Outlay Act defined the expenditure authority of DOTD and other state agencies. DOTD encumbered the money by moving the expenditure authority for a particular amount from the state treasury to DOTD. Oglesby explained that many of these steps occurred simultaneously but that work did not begin until the contract was executed, the Federal-Aid agreement received and the funds encumbered.
The next step described by Oglesby was DOTD's issuance of the Work Order or Notice to Proceed, authorizing the contractor to begin work. Typically the contractor billed monthly. Once a DOTD project engineer determined that the work had been properly done, then DOTD paid 100% state money to the contractor. According to Oglesby, once DOTD paid the contractor, DOTD then applied for reimbursement from FHWA.
If project changes made the encumbered funds insufficient, Oglesby said that using the process described above, DOTD obtained a new Cost Distribution used to encumber additional state funds along with a modification, a federal document increasing the level of the federal participation. The modification changed the Federal Aid Project Agreement to increase the total project cost. The additional funds again initially came 100% from DOTD encumbered funds from the state treasury, subject to later federal reimbursement. According to Oglesby, encumbering additional funds for a particular project did not increase DOTD's overall state budget. Oglesby stated that FHWA personnel had an active knowledge of ongoing projects and after review, approved any large changes to a project. Oglesby stated this particular project, State # XXX-XX-XX, was modified many times during the construction.
Concerning FHWA participation at the rate of 90% for attorneys' fees in this litigation, Oglesby stated that State Project # XXXXXXXXX was "Recovery Costs for Hazardous Material Cleanup," a professional services contract for work including *450 this project. Because the recovery was tied to interstate work, Oglesby reported it was federally reimbursable at the rate of 90%.
Oglesby stated he viewed DOTD's relationship with FHWA as a "stewardship agreement." The federal government provided money for each state highway organization to build and maintain roads. FHWA did not contract the work but allowed the states to act as its agent which is the reason for the agreement process. Oglesby made sure that the processes were properly followed and documented so that the FHWA money was used appropriately.
After completion of a construction project, DOTD disposed of any excess property acquired for the right of way and reimbursed FHWA for its percentage of the proceeds. As another example of DOTD returning funds to FHWA, Oglesby described litigation over faulty pipe used in road construction. DOTD reimbursed to FHWA its percentage of participation from funds recovered in a settlement.
Oglesby testified he was unaware of any law or directive regarding environmental clean-up. He reiterated that DOTD policy was to return to FHWA in the same percentage as its participation any funds recovered by DOTD. Oglesby also stated that when there was an unanticipated expenditure such as environmental clean-up, that is an additional cost. Since funding is limited by both the state and federal government, that money is not available to be used elsewhere.

DOTD's Statement of Contested (sic) Facts in Opposition to Crystal's Fifth MPSJ
Filed with its opposition, DOTD stated:
DOTD represents that there are no genuine issues of material fact, and that Crystal is not entitled to judgment as a matter of law as to the following issues to be decided by the court:
 Whether Crystal is entitled to any windfall reduction of its liability solely by reason of joint federal-state highway construction funding mechanism, whereby the federal government participated in the cost of highway construction, including the cost of remediating the property in question.

KCS Joined Crystal's Fifth Motion for Summary Judgment
In an opposition filed July 20, 2001, KCS opposed DOTD's Motion in Limine and joined Crystal's Motion to Compel and Motion for Partial Summary Judgment.

Crystal's Reply Memo Supporting its Fifth MPSJ
Pointing to the 90% reimbursement paid by FHWA to DOTD, Crystal urged that DOTD's opposition established that (1) FHWA incurred the vast majority of the remediation costs; (2) DOTD has no standing or authority to recover money expended by FHWA; and (3) DOTD has no intention of repaying FHWA if it recovers remediation costs.
Referring to language in DOTD's opposition, Crystal proclaimed that DOTD conceded that FHWA incurred 90% of the remediation cost by asserting that the federal participation was not a repayment of costs to DOTD, but was payment of remediation costs "in fulfillment of FHWA's contractual obligation to DOTD, not in reduction of Crystal's liability." Crystal further urged that, since the costs were not incurred by DOTD, DOTD's recovery would violate (a) the LEQA (which limits recovery to costs "incurred"), (b) common law indemnity rules prohibiting recovery of more than the amount the party has been impoverished along with La. C.C. art. 2298, and (c) the public policy prohibiting double recovery.
*451 Next, Crystal again urged that DOTD had no standing to bring the action to recover FHWA's portion of remediation and that DOTD had no "real and actual interest" in the funds because DOTD suffered no loss. Referring to Oglesby's deposition, Crystal noted Oglesby stated he was not aware of any provision or amendment to the project agreement that specifically set out procedures in the event of an environmental clean-up. As to FHWA's participation in this particular clean-up, Oglesby knew of nothing except change orders on the project and the Professional Services Contract. Since nothing prevented FHWA from pursuing Crystal for the same remediation costs, Crystal averred it would be subject to the risk of having to pay the same claim to multiple parties.
In Crystal's view, DOTD effectively conceded no partnership existed between DOTD and FHWA. DOTD stated in its opposition that the relationship was "like" a partnership, but acknowledged that the analogy was incomplete because FHWA was not liable for damages in highway construction due to the action of DOTD's contractors. Crystal urged that DOTD provided no legal basis for its claims that DOTD could recover the federal money and that DOTD had a legal interest in federally-reimbursed costs.
In Oglesby's deposition, he explained that the "Gold Book" [Louisiana Standard Specifications and Roads and Bridges, 1982 Edition] was stronger than guidelines and constituted the rules. Crystal attached a portion of the chapter on Legal Relations in DOTD's "Gold Book" providing that in joint federal/state projects, the FHWA had the right to approve and inspect projects. "Such inspection shall not make the Federal Government a party to the contract and will not interfere with the rights of either party thereunder."
Crystal argued that none of the documents attached to DOTD's opposition supported DOTD's assertions that the documents gave authorization and direction for DOTD to recover FHWA's remediation costs. Crystal's discussion of those documents follows.

"Interim Guidance For Hazardous Waste Site Affecting Highway Project Development," dated August 1988
Contrary to DOTD's assertion that the document was "FHWA's policy and instructions to state highway departments," Crystal noted that the Interim Guidance was an internal FHWA document directed to "Regional Federal Highway Administrators and Direct Federal Program Administrators." The Purpose section of the document states: "This guidance is intended to provide a framework around which effective processes for dealing with hazardous substances/wastes can be built." In "V. General Eligibility and Participation Policy Guidance", the Interim Guidance provided that federal funds should be used only as a last resort to clean up or dispose of hazardous material on existing projects. According to the document, federal participation in a clean-up could occur if (1) Federal law clearly establishes the state highway department responsibility for clean-up on federal aid projects. When the FHWA has worked closely with the state highway department in developing the project and in approving key decisions, then FHWA has an obligation as partners with the state highway department to participate in order to complete the project; or (2) the FHWA and the state highway department knowingly agree to accept the responsibility from others responsible in order to expedite the completion of a much needed project, with the understanding that the necessary efforts will be pursued to recover the costs of the clean-up from the responsible party.
*452 Asserting that the guidance was not a statute and did not have the force of law, Crystal argued the document was merely an understanding directed to federal highway officials, not state officials, and in any event, did not authorize state agencies to recover federally paid costs.

FHWA Internal Memorandum dated 9/27/91
Virginia I. Cherwek, Chief, Environmental and Right-of-Way Law Branch of the FHWA, directed a memo to "All Regional Counsels" stating that FHWA participation in the clean-up of hazardous waste continued to be governed by the Aug. 5, 1988 Interim Guidance. Further, federal participation was made with the understanding that necessary efforts would be pursued to recover the clean-up costs from the responsible parties. Ms. Cherwek raised the issue of possible difficulties in recovering the federal share of the cleanup cost from the responsible party because the state had already received that portion of its costs from FHWA. To avoid the possible problem, the memo suggested having the project agreement include a provision that the State was to use its best efforts to seek a recovery of its clean-up costs from the responsible parties as a condition of federal participation. Since she was not aware of any decided cases on the recovery of clean-up costs by a state agency, Ms. Cherwek requested to be advised of any decisions or litigation.
Ms. Cherwek attached a Washington State Department of Transportation attorney's memo which concluded that the Washington state agency had the right to recover the federal share of clean-up costs. The writer opined the Washington highway department was a real party at interest in the litigation because there is no federal statute forbidding a state from recovering funds paid to the state by the federal government. According to the writer, there was an agreement between the FHWA and the state department of transportation that the Washington Transportation Department would pursue a recovery action on behalf of the federal government.
Crystal argued that Cherwek's letter and memo conferred absolutely no authority on DOTD to act for FHWA.

FHWA Letter to DOTD dated 2/7/94
In response to DOTD's request that FHWA provide a document setting forth FHWA policy regarding state recovery of federal contributions to environmental clean-up on federal aid highway projects, the FHWA letter dated February 7, 1994 referred to the Interim Guidance and the Cherwek letter and memo discussed above.

FHWA Internal Memo dated 7/17/97
FHWA responded to an inquiry by an FHWA Regional Counsel which indicated Louisiana was pursuing recovery of environmental clean-up costs, the majority of which was acquired from the federal government.
You further state that before Louisiana devotes additional resources to the recovery effort, it wants to know what will happen with the recovered funds. If the state is unable to retain the monies recovered, the state will halt the project.
Wilbert Baccus, Associate Chief Counsel of the FHWA, provided a complex explanation of federal funding for interstate highway construction. Baccus concluded that interstate construction (IC) funds recovered from responsible parties could be added to Louisiana's current unobligated balance of IC funds and be available for obligation to fund remaining unobligated IC eligible work. Stating that Louisiana's hazardous waste recovery initiatives were beneficial to the federal highway program, Baccus concluded that the use of the federal funds recovered had to be consistent *453 with the IC program, fiscal law of deobligations and federal statutory requirements related to use or transfer of IC funds. According to Crystal, the foregoing statement (that recovered funds could be added to Louisiana's current unobligated balance of IC funds) meant that DOTD could use the funds for other projects and contradicted DOTD's claim in its opposition that DOTD was subject to repaying the federal funds to the FHWA.
In conclusion to the reply memo, Crystal argued that the collateral source rule was inapplicable to this matter, because the FHWA was not a collateral source. Crystal stressed that this rule's application is limited to tort cases. Crystal distinguished Griffin v. Louisiana Sheriff's Auto Risk Association, 1999-2944 (La. App. 1st Cir. 6/22/01), 802 So.2d 691, writ denied, 2001-2117 (La.11/9/01), 801 So.2d 376, which held that in a personal injury case, the collateral source rule was applicable to contractual write-offs by medical providers obtained by insurance companies in exchange for providing a volume of business.

Trial Court's Reasons for Judgment
While agreeing with the benefits of a modern national highway system, the trial court noted that, under the law, DOTD was treated like any other legal entity. DOTD had not shown any special legal exceptions inuring to the benefit of DOTD. The trial court agreed with Crystal's argument that DOTD would receive a double recovery if it were paid the federal share of remediation by Crystal. The trial court cited the strong public policy that a plaintiff may not recover the same damages twice from two separate entities, since that would be an impermissible double recovery or windfall to the plaintiff.
The trial court distinguished the antitrust jurisprudence relied upon by DOTD which dealt with the direct purchaser rule in anti-trust cases and applied only to antitrust cases. Moreover, the trial court specifically found there was no legal basis for DOTD's allegation that a partnership-type relationship existed between DOTD and FHWA. The trial court observed that the collateral source rule is limited to tort cases and therefore, is inapplicable to the instant situation. Further, the trial court found the relationship between DOTD and FHWA to be contractual, "nothing more, nothing less."
Although the trial judge, as a federal and a state taxpayer, had sympathy with the goal of DOTD to recover the remediation costs from the defendants, the trial court found no legal basis which supported DOTD's claim. The trial court concluded that DOTD could not recover remediation costs previously reimbursed to DOTD by FHWA. Therefore, the partial summary judgment was granted.

Judgment on Crystal's Fifth Motion for Partial Summary Judgment
In addition to addressing other motions, the judgment signed August 20, 2001, granted Crystal's Fifth MPSJ in which KCS joined. Specifically, the judgment stated that "the Louisiana Department of Transportation and Development may not recover from defendants any sums for which it has received reimbursement from the federal government." Notice of the judgment was sent on August 24, 2001.

DOTD's Motion for New Trial
DOTD filed a Motion for New Trial on this partial summary judgment. In response to the trial court's conclusion that DOTD's recovery of remediation costs would be an impermissible double recovery, DOTD urged that the federal share of the remediation costs would belong to the federal government, not DOTD. The uncontradicted evidence established that, upon recovery, the federal share would *454 belong to the federal government, according to DOTD. DOTD posited that the uncontradicted evidence established that DOTD was acting on behalf of FHWA and that the trial court did not rule on this issue. Finally, DOTD stated that, at a minimum, there were genuine issues of material fact as to the ownership of the money which precluded the grant of the partial summary judgment.
In addition to relying upon the Oglesby deposition and the Baccus memorandum discussed previously, DOTD attached to its memorandum in support of the new trial motion an affidavit by William A. Sussman, the FHWA Louisiana Division Administrator. Sussman averred that
 The FHWA looked to each state highway department to make a good faith effort to recover costs of construction that are subject to recovery, such as costs of collusive bidding and environmental remediation.
 The federal percentage of recovered funds are reimbursed to FHWA which deposited the money in the Highway Trust Fund.
 If DOTD only recovered the state's 10% contribution to the clean-up, DOTD will still have to give 90% of the 10% recovered to FHWA.
 The recovered funds would be electronically transferred and the funds will be physically returned to FHWA.
 The recovered federal share would be credited to the Louisiana Interstate Construction account within FHWA.
 FHWA has not given the federal share of any recovery to DOTD and use of the recovered share of federal clean-up costs can be made in Louisiana provided all requirements are met.
 Reference to retention of the funds by DOTD meant that the funds could be used as federal participation on future projects in Louisiana if the FHWA criteria are met.
 Since 1988, FHWA's written policy requires state highway departments to attempt to recover federal funds used for remediation.
 Since 1988, FHWA has instructed and authorized state highway agencies to recover the federal share of remediation.
 DOTD is acting on FHWA's behalf in seeking to recover the federal share of the remediation.
 If DOTD recovers the federal share, FHWA will not pursue any claim to recover costs of remediation from defendants.
 FHWA is paying 90% of the costs of this litigation.
Kam K. Movassaghi, Secretary of DOTD, also supplied an affidavit which DOTD filed in support of the new trial. The secretary reviewed the federal participation in the project and the remediation. Movassaghi stated that as a condition of paying 90% remediation costs, FHWA required and authorized DOTD to make a good faith effort to recover the costs of remediation including the federal share and to repay FHWA its share of any recovery. In addition to repeating much of the information in the Sussman affidavit, Movassaghi stated there was no current IC funding and that unless FHWA transferred the recovered funds to other federal funding categories such as interstate maintenance or national highway system fund, the recovered federal share would lapse and be returned to the Highway Trust Fund and be unavailable to Louisiana.
Wilbert Baccus also supplied an affidavit devoted to explaining his 1997 memorandum discussed earlier. The purpose of the 1997 memo (which dealt only with the federal share) was to provide legal advice to field counsel so as to assist FHWA and *455 DOTD in the administering of the federal share upon recovery. The federal remediation funds were primarily IC funds and recovered funds would also be IC funds.
Baccus explained his 1997 statement apparently received by FHWA from DOTD: "[I]f the state is unable to retain the monies recovered, the state will halt the project" (that is, the action to recover the remediation costs.) Baccus swore that:
(1) He did not mean and did not understand that DOTD would halt the cost recovery if DOTD could not keep the federal share as state monies.
(2) He meant and understood that DOTD wanted FHWA to permit the federal share to be available as federal participation in future federal aid projects in Louisiana, after recovery and reimbursement of the money to FHWA and after legal requirements for use of FHWA funds were met.
When Baccus stated recovered funds could be added to "Louisiana's current unobligated balance of IC funds," he swore he did not mean the money would be added to Louisiana state funds. Instead, Baccus meant that, after recovery and reimbursement to FHWA, the law allowed the Highway Trust Fund to use the money for future IC projects in Louisiana.
References to transfers to other funding categories referred to federal, not state funding categories, according to Baccus. Since there is no current IC funding, Baccus explained that unless FHWA can and does transfer the recovered funds to other federal funding categories, the recovered federal share will lapse and be returned to the Highway Trust Fund and be unavailable to Louisiana. If the remediation costs are not characterized as "repayment of actual construction costs," the funds would be paid into the general fund of the U.S. Treasury and not be used for highways, according to Baccus.

Crystal's Response
Crystal argued that DOTD's motion for new trial should be denied because the trial court's judgment was correct and there had been no miscarriage of justice. Further, the additional material attached to DOTD's new trial motion should not have been considered because there was no showing that it was newly discovered nor that every reasonable and diligent method had been used to obtain it prior to the initial hearing. The remaining arguments were primarily repetitive of previously stated positions.

DOTD's Reply
In reply to Crystal's opposition to its request for a New Trial, DOTD again urged that summary judgment was inappropriate, since there were genuine issues of material fact (notwithstanding DOTD's previous stipulation to the trial court that none existed.) DOTD again urged that FHWA would own the federal share of any recovered funds. As to the new attachments to its Motion for New Trial, DOTD asserts that the affidavits do not raise new issues or concepts but further support DOTD's interpretation of the evidence. Regardless of whether the new information could have been discovered sooner, DOTD contends it is discretionary with the court to review the new information, which are factual assertions and not conclusions of law. Like Crystal, DOTD repeated many arguments made earlier in the litigation.

Trial Court's Reasons for Denying DOTD's Motion for New Trial
On October 3, 2001, the trial court denied DOTD's Motion for a New Trial in a Judgment with Reasons. The trial court stated that

*456  It had properly ruled that DOTD's recovery of remediation costs previously reimbursed by FHWA would constitute a prohibited double recovery.
 No genuine issues of material fact existed with regard to that legal conclusion.
 DOTD essentially reiterated its previous arguments made in the Fifth MPSJ.
 According to its pleadings, DOTD sued only in its own right, not in an agency capacity on behalf of FHWA.
 There was an insufficient basis for the court to conclude that FHWA expressly authorized DOTD to sue on its behalf.
 DOTD sought to repackage its previous arguments by attaching additional affidavits without demonstrating that it made a diligent effort to procure the evidence and was unable to obtain it prior to the submission for decision of the Motion for Summary Judgment or that the evidence was discovered after the Motion for Summary Judgment was submitted for decision.

DOTD's Motion to Designate Partial Summary Judgment as Final
Thereafter, DOTD filed a Motion to Designate the Partial Summary Judgment as Final because there was no just reason for delaying an immediate appeal. In Custom-Built Cabinet and Supply, Inc. v. Quality Built Cabinets, Inc., 32,441 (La. App.2d Cir.12/8/99), 748 So.2d 594, this court explained that trial courts should give written reasons for La. C.C.P. art. 1915(B) certification in order to facilitate appellate review. When the trial court provides written reasons, the proper standard of review of the finding that a judgment is immediately appealable is whether the trial court abused its discretion. In Banks v. State Farm Insurance Company, 30,868 (La.App.2d Cir.3/5/98), 708 So.2d 523, this court set out the criteria for determining whether a partial judgment is immediately appealable:
(1) The relationship between the adjudicated and unadjudicated claims;
(2) The possibility that the need for review might or might not be mooted by future developments in the district court;
(3) The possibility that the reviewing court might be obliged to consider the same issue a second time;
(4) The presence or absence of a claim or counterclaim which could result in setoff against the judgment sought to be made final; and
(5) Miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.
See Custom-Built, supra, at p. 605.

Trial Court's Reasons for Designating Judgment as Final
The trial court concluded that
(1) designating this partial summary judgment as final would not affect a later determination of DOTD's claim for the state's share of remediation costs;
(2) little likelihood existed that issues raised in this judgment would have to be revisited on an appeal after trial;
(3) facts or evidence relating to this judgment would not be relevant to DOTD's remaining claim;
(4) a disposition of the issue of DOTD's recovery of the federal share of the clean-up would materially advance the litigation and significantly enhance the prospects for successful mediation; and

*457 (5) judicial efficiency would be served because "remand after trial on the issues of agency and double recovery could become necessary if the court of appeal reverses the trial court after trial on the merits on the issues now remaining before the court."
DOTD did not appeal the denial of its Motion for New Trial.

DISCUSSION
A reviewing court examines summary judgments de novo under the same criteria governing the district court's consideration of whether summary judgment is appropriate. This court must ask the same questions the trial court considers in determining whether summary judgment is suitable; i.e., whether there is any genuine issue of material fact, and whether the mover is entitled to judgment as a matter of law. Robinson v. Heard, XXXX-XXXX (La.2/26/02), 809 So.2d 943.
In Row v. Pierremont Plaza, L.L.C., 35,796 (La.App.2d Cir.4/3/02), 814 So.2d 124, this court explained that summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966. The mover has the burden of establishing the absence of a genuine issue of material fact. However, if the movant will not bear the burden of proof at trial on the matter before the court, the movant's burden on the motion does not require it to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. La. C.C.P. art. 966(C)(2). Thereafter, if the adverse party fails to produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden of proof at trial, there is no genuine issue of material fact. The party opposing summary judgment cannot rest on the mere allegations of its pleadings, but must show that it has evidence which could satisfy its evidentiary burden at trial. Row, supra.
In order to address the multiple and overlapping issues as well as the myriad alternative arguments made by DOTD and the defendants, this court grouped all issues into three major areas: DOTD's Right of Action or Standing, Double Recovery, and DOTD's Authority to Act for FHWA.

DOTD's Right of Action or Standing
At the outset, we note that the peremptory exception of No Right of Action raises the question of whether, as a matter of law, the particular plaintiff falls within the general class in whose favor the law extends a remedy. Dean v. La., DOTD, 32,816 (La.App.2d Cir.12/8/99), 749 So.2d 846, writ denied, XXXX-XXXX (La.2/25/00), 755 So.2d 887. Clearly, DOTD, at least, has a right of action to seek recovery of the 10% of remediation costs paid by the State of Louisiana. Defendants acknowledge this.
As to the 90% paid by FHWA, it is not necessary to address whether the defendants more properly should have filed a partial peremptory exception of no right of action[4] (instead of the motion for partial summary judgment). La. C.C.P. art.1915 *458 provides that when the court renders a partial summary judgment or sustains an exception in part, the judgment shall not constitute a final judgment unless it is designated as a final judgment by the court and the court makes an express determination that there is no just reason for delaying an immediate appeal. The trial court has designated the judgment as final and expressly found there is no just reason for delaying an immediate appeal. Therefore, regardless of the procedural vehicle, the issue is properly before this court for review.
As to DOTD's complaints about not being able to amend its petition since the matter was decided via the grant of a partial summary judgment, those complaints are inadequate and unpersuasive. Under La. C.C.P. art. 934, a party can amend after a peremptory exception is sustained while no amendment is allowed after a partial summary judgment. Since Crystal raised the issue in an answer filed in July, 2000, DOTD was well aware of the dispute concerning its authority or standing to seek recovery of the 90% remediation costs paid by the FHWA to DOTD. DOTD could have amended its pleadings or provided persuasive evidence in opposition to the defendants' MPSJ, but failed to do so.
Because DOTD unquestionably has a right of action to seek recovery of DOTD's portion (10%) of the remediation costs, we defer consideration of DOTD's standing to pursue the FHWA portion (90%) to the discussion on the merits of defendants' MPSJ.

Double Recovery
The jurisprudence is replete with references to Louisiana's public policy against double recovery. Non-duplication of recovery is codified in La. R.S. 22:1386, the express purpose of which is to prevent double recovery. See Senac v. Sandefer, 418 So.2d 543 (La.1982). In Kennard v. Kennard, 99-445 (La.App. 3d Cir.10/6/99), 747 So.2d 628, writ denied, 99-3550 (La.2/25/2000), 755 So.2d 252, the court disallowed recovery from the ex-wife of an education contribution to the wife that had been "taken care of" in the community property partition, since that would be an unlawful double recovery by the husband.
In Ledet v. Seasafe, Inc., XXXX-XXXX (La. App. 3d Cir.4/4/01), 783 So.2d 611, writ denied, XXXX-XXXX (La.6/10/01), 793 So.2d 1230, a worker's compensation provider was permitted to intervene in an intentional tort action to seek recovery of worker's compensation benefits from the party directly responsible for the worker's injury. The Ledet court reaffirmed the public policy against double recovery.
While affirming the judgment, the appellate court in Adler v. American National Property and Cas. Co., 99-3182 (La. App. 4th Cir.9/20/00), 769 So.2d 698, amended the portion of the trial court judgment awarding 100% of the costs against each of the defendants held liable, since that would result in a double recovery to the plaintiff. A plaintiff is not entitled to a windfall, but is to be placed in the same position as before its property was damaged, but not a superior position. Mossy Motors, Inc. v. Sewerage and Water Bd. of the City of New Orleans, 98-0495 (La.App. 4th Cir.5/12/99), 753 So.2d 269, writ denied, 99-2102 (La.10/29/99), 749 So.2d 638.
The trial court ruled here that for DOTD to be paid the federal share of the remediation costs previously reimbursed to DOTD by FHWA would be an impermissible double recovery. In an effort to circumvent that finding, DOTD argued for the first time in its Motion for New Trial and on appeal that FHWA owned the 90% of remediation costs paid to DOTD; therefore, there was no double recovery by *459 DOTD. At oral argument and in brief, the defendants agreed that the 90% of remediation costs belonged to FHWA; however, the defendants contended that DOTD sued to recover in its own right and did not have authority to act for FHWA.

Anti-trust Jurisprudence
Contending that the defendants should not be permitted to reduce their alleged liability due to federal ownership of the federal remediation payments, DOTD cited State of New York v. Hendrickson Brothers, Inc., 840 F.2d 1065 (2d Cir.1988), U.S. cert. denied, a civil anti-trust action brought against contractors and officers for bid rigging on highway contracts. Under federal and state anti-trust laws, the State of New York sued to recover treble damages from the participants in a complex system of fixing bids. On appeal from the jury's award of treble damages to New York, the defendants argued that the state was not entitled to recover some 75% of the money because the federal government contributed funding to the projects. In rejecting that argument, the appellate court cited the "Direct Purchaser Rule" which, generally, is that the person who purchased directly from the price fixer at an artificially high level is deemed to have suffered the anti-trust injury. The court further observed that the rationale for the rule was that the anti-trust treble damage action should not be complicated by a need to trace the effects of the overcharge. Noting that New York was the direct purchaser from the contractors, the court observed that any depletion of the federal coffers was derivative and not direct. The federal government's obligation ran to the state of New York and dealt only with the state.
The Hendrickson court also rejected the defendants' argument that this was a "cost-plus" type contract contemplated in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). The Hanover court observed that a "passing on" defense "might" be permitted in a "cost-plus" contract because the customer was committed to buy regardless of the price. With understatement, the Hendrickson court observed that the matter of federal funding of highway construction is a complicated one. The defendants argued that the federal money was allotted in particular categories and that money allotted for one category could not be used for another category for which funds were depleted. Absent a showing that the effect of the overcharge was essentially determined in advance, the defendants could not pursue their allegation that federal funds spent on overcharges would have been available, absent the overcharges, for other highway construction in that category. The Hendrickson court held that to do so would defeat the primary purpose of the direct purchaser rule which was to eliminate the need to explore such complexities.
Whether the federal government was entitled to a portion of the damages collected by New York was not at issue in Hendrickson. In dicta, the Hendrickson court observed that if the federal government eventually obtained part of the damages, the purpose of the anti-trust laws would have been served by the wrongdoer having paid the party directly injured. In a policy pronouncement not necessary to the ruling, the Hendrickson court went on to observe that if the federal government never received part of the damages, "it is possible the State will have received a windfall; but the State plainly has a greater right to any windfall than have the defendant wrongdoers." 840 F.2d at p. 1080.
The trial court correctly determined that Hendrickson, supra, was distinguishable and inapplicable to this litigation. That *460 New York case pertained to anti-trust litigation arising out of price fixing. The decision was based upon the unique antitrust "Direct Purchaser Rule" and has no relevance to this dispute.
Likewise, the trial court refused to apply another anti-trust case cited by DOTD, State of Tennessee ex rel. Leech v. Dole, 749 F.2d 331 (6th Cir.1984), U.S. cert. denied, a fight between the State of Tennessee and the federal government over damages the state recovered from bid riggers on federally funded road projects. The state sought to enjoin the federal government from setting off the settlement funds received by Tennessee against state vouchers submitted to the federal government for repayment for current highway projects. In Crystal's view, Leech supports its view that the state would be unjustly enriched if it were permitted to collect the money first from the federal government and again in an anti-trust settlement with bid riggers. On the other hand, DOTD contends that Leech means that because the federal government may be entitled to some portion of Tennessee's recovery from the bid riggers, the bid riggers may not reduce their own liability on account of the federal government's potential right to recovery from the state.
As pointed out in brief by Crystal, Leech did not address the standing of the state to seek recovery of the federal portion. Leech concerned funds previously paid to Tennessee in settlement of an anti-trust action. The Leech opinion dealt extensively with the proper forum for the litigation, with the appropriate legal principles applicable, and with applicability of equitable estoppel based upon a conversation between the Tennessee Attorney General and an anti-trust Assistant U.S. Attorney General. The opinion held that the federal district court had jurisdiction and that federal common law governed the government's unjust enrichment claims against the state. After noting the flexibility of the laws of restitution, the Leech court held that the record was insufficient to decide the dispute and remanded the case for a determination of myriad factors to determine and balance the equities concerning the amount of the federal share the state should retain or pay the federal government. In our view, the Leech litigation is so far removed factually and legally from the instant controversy as to make it irrelevant. The trial court properly declined to apply it to this dispute.

Collateral Source Rule
DOTD relied on the collateral source rule as a means to circumvent the prohibition against double recovery. DOTD argued that its patrimony had been reduced because its limited federal funding was used to pay remediation costs. In Suhor v. Lagasse, XXXX-XXXX (La.App. 4th Cir.9/13/00), 770 So.2d 422, the court explained that the collateral source rule provides that a tortfeasor is generally not entitled to a credit for payments made to a plaintiff by a collateral source independent of the tortfeasor's contribution. This prevents the wrongdoer from benefitting from the plaintiff's foresight in buying insurance or other benefits. Among the reasons for the rule was that the plaintiff's patrimony was injured if he was forced to recover from outside sources for damages. Further, the rule encouraged the purchase of insurance by individuals. Also the rule promoted tort deterrence and accident prevention. The Suhor case held that the collateral source rule did not give a tort victim the right to recover medical expenses extinguished by operation of federal law governing Medicare benefits. At issue were amounts written off by health care providers in order to be eligible to receive direct payments from Medicare. The Suhor court noted that the policy *461 considerations of the collateral source rule were not present. The benefit of the amounts written off were not procured by the plaintiff, but occurred by operation of law. Moreover, the plaintiff's patrimony was not diminished because the health care charge was extinguished by operation of law when the health care provider opted to accept Medicare payments. Finally, the plaintiff would have received a windfall if she were permitted to recover the amounts that the health care provider is prohibited by federal law from accepting from her.
In Griffin, supra, the collateral source rule was applied. The plaintiff was a state employee insured by State Employees Group Benefits Plan (SEGB) under the terms of which a health care provider agreed to accept the difference between the amount allowed by the plan and the amount normally charged by the provider. In this case the stipulated amount of medical expenses was $89,909.05 and the amount paid by the plan was only $42,169.72. The plaintiff wanted only the amount of the medical expenses revealed to the jury. The court agreed.
The "collateral sources" doctrine serves to prevent the defendant from receiving a windfall because the victim has chosen to provide, by contract, other sources of redress for injury. Under the collateral source rule, a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be diminished, because of benefits received by the plaintiff from sources independent of the tortfeasor's procuration or contribution. Under the rule, the payments received from the independent source are not deducted from the award the victim would otherwise receive from the tortfeasor.
802 So.2d at pp. 713-714.
The Griffin court reasoned that the plaintiff's patrimony was extinguished to the extent she had to pay premiums in order to secure the benefits of health insurance. Since the "write-offs" were procured through her premiums, they were not a windfall. Further, the tortfeasor's responsibility should be the same whether the injured party was insured or uninsured. Therefore, Mrs. Griffin could seek recovery of the entire amount of the stipulated medical expenses and was not limited to the amount the doctor accepted via the contract with SEGB.
Crystal correctly argued that the collateral source rule is a tort-based concept with a limited application. This environmental clean-up dispute does not involve insurance, tort deterrence or accident prevention. The rule is not applicable here.

DOTD's Authority to Act for FHWA
As noted earlier Crystal raised the issue of DOTD's standing or authority to pursue the federal share of remediation costs in an answer filed July 3, 2000. As an alternative argument in its opposition to Crystal's MPSJ, DOTD contended that FHWA had specifically authorized DOTD to recover the federal share of the money spent to clear contamination from the site. In its Motion for New Trial and on appeal, DOTD agreed with Crystal that the federal 90% of remediation costs belong to FHWA.
La. C.C.P. art. 681 provides that:
Except as otherwise provided by law, an action can be brought only by a person having a real and actual interest which he asserts.
The comments to the article note that the phrase "except as otherwise provided by law" prevents a conflict with articles governing those suing in a representative capacity, including La. C.C.P. art. 694 which states:
An agent has the procedural capacity to sue to enforce a right of his principal, when specially authorized to do so.

*462 For all procedural purposes, the principal is considered the plaintiff in such an action. The defendant may assert any defense available against the principal, and may enforce his rights against the principal in a reconventional demand. (Emphasis added.)
Whether FHWA had given DOTD special authority to bring suit on its behalf was not specifically addressed in the trial court's oral bench ruling on the MPSJ. However, in its denial of DOTD's motion for new trial on the MPSJ, the trial court specifically stated that DOTD had not presented sufficient evidence to establish that FHWA had specially authorized DOTD to sue to recover the federal share on behalf of FHWA.
In addition to asserting that DOTD cannot recover the federal share in which DOTD has no real and actual interest, Crystal has repeatedly stressed that the pleadings do not indicate that DOTD brought the action in a representative capacity but instead sought to recover all remediation costs which allegedly were incurred by DOTD. DOTD on appeal agreed with Crystal that the 90% remediation costs belong to FHWA. At oral argument, DOTD acknowledged that to have alleged its representative capacity would have been better. Notwithstanding the pleadings, the primary issue to be resolved is whether DOTD presented sufficient evidence in opposing the summary judgment to show that it could satisfy its evidentiary burden at trial of proving FHWA's special authority. Row, supra.
On appeal, DOTD argued that the evidence established a genuine issue of material fact regarding DOTD's authority to sue for FHWA. As previously noted, DOTD in opposition to the MPSJ filed a "Statement of Contested (sic) Facts" which included the statement "DOTD represents that there are no genuine issues of material fact." La. C.C. art. 1853 states, in part that "A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it." DOTD cannot now complain that there are genuine issues of material fact. This disingenuous argument is without merit.
In addition, DOTD argued to this court that the FHWA specially authorized DOTD to recover the federal share of the remediation costs. DOTD relied upon documents previously provided to the court, DOTD's filing to recover all the remediation costs and FHWA's participation in 90% of the recovery costs including the legal fees for the attorneys.
In DOTD's view, the 1988 Interim Guidance contained FHWA's requirement that state highway agencies recover federal funds spent for remediation as a condition of FHWA participation and references the portion of the Guidance which sets out conditions in which the FHWA may participate in environmental clean-up (Part. V. General Eligibility and Participation Policy Guidance"); i.e., FHWA wishes to avoid a contaminated site and will participate only as a last resort when (1) the FHWA has worked closely with the state agency in developing the project and has an obligation to participate to complete the project or (2) the FHWA and the state agency knowingly accept the responsibility to expedite the completion of a much needed project with the understanding that necessary efforts will be pursued to recover the costs from responsible parties.
The Guidance, an internal document directed to federal administrators, had the stated purpose of providing "a framework around which effective processes for dealing with hazardous substances/wastes can be built." Obviously, the document is not a statute or a regulation. Most significant is that nowhere does the Guidance specially *463 authorize DOTD to sue on behalf of FHWA.
DOTD also relied upon another internal FHWA memorandum, the 9/22/91 memo from the chief of the FHWA Environmental and Right of Way Branch, Virginia I. Cherwek, to all regional counsel. Therein, Cherwek stated that FHWA participation in environmental clean-ups continued "to be governed" by the 1988 Interim Guidance and quoted the provision discussed above that FHWA would participate with the state to complete a needed project "with the understanding that the necessary efforts will be pursued to recover the costs of the clean-up." Although DOTD interpreted the foregoing as authorizing DOTD to sue on behalf of FHWA, the Cherwek memo does not provide that authorization. While noting that Guidance anticipated the state would pursue those responsible, the memo addressed the particular problem raised in this litigation; i.e., the difficulties the state may have in recovering the federal share of the cleanup costs, because the state had "already received that portion of its costs from the FHWA." Cherwek suggested a possible way to avoid the problem was to have the project agreement include a provision requiring the states to use their best efforts to recover clean-up costs from responsible parties as a condition of federal funding. DOTD interpreted the foregoing as requiring that the state recover FHWA remediation costs which in turn authorized the state to act for the FHWA. Actually, the document did neither. The Cherwek memo did not specially authorize Louisiana or any state to act for FHWA in recovering remediation costs.
When the DOTD requested "a document setting forth ... [FHWA] policy regarding state recovery of costs it has incurred in cleaning up contaminated property" in a federally funded project, Jean G. Rogers, Regional Counsel, FHWA, in a 2/7/94 response sent the 1988 Interim Guidance and the 1991 Cherwek memo. Rogers relied upon the language from the Guidance stating that FHWA clearly anticipated that the state would attempt to recover cleanup costs from responsible parties. While no doubt reflecting FHWA's "anticipation," none of the documents conferred specific authority on DOTD to sue to recover FHWA's portion of the remediation costs.
DOTD also cited as support for FHWA's authorization for DOTD to sue to recover the federal share of remediation costs on behalf of FHWA the fact that DOTD did, in fact, sue to recover all of the remediation costs including FHWA's 90% of the costs. That somewhat unusual position is not persuasive to this court. Next, DOTD relied upon FHWA's agreement to fund 90% of the expenses including attorneys' fees for this litigation. Oglesby stated in his deposition that a services contract (made with FHWA for litigation expenses which were reimbursable to the state from FHWA) was "tied to" interstate construction. That services contract by FHWA to share the litigation expenses in the federally-funded project reflected FHWA's anticipation of recovery of costs by those responsible for pollution.
Obviously, the most relevant document to set out the relationship between FHWA and DOTD is the project agreement itself which is contained in this record. This document contained no special authority to DOTD to sue to recover on behalf of FHWA the 90% of the remediation costs paid by FHWA to DOTD.

CONCLUSION
The parties raised two important public policies in arguing the merits of this litigation. First, windfall or double recovery is unlawful. Second, wrongdoers should *464 bear the responsibility and the costs of repairing damages which they caused. This court recognizes and supports both legal concepts. In this matter there is potential for those two important principles to conflict if the defendants are ultimately found liable for the alleged environmental contamination which slowed and increased the cost of this highway construction ultimately funded by both state and federal taxpayers. Although the possibility that alleged polluters might escape responsibility at the expense of the taxpayers is disturbing, this court must render decisions based upon the record on appeal. La. C.C.P. art. 2164.
In response to questioning at oral argument, counsel for DOTD stated it was difficult to get things from FHWA. As early as 1991, an internal FHWA memo raised the very issue that is presented in this litigation and suggested a possible remedy would be to have the project agreement include a provision requiring the states to use their best efforts to recover clean-up costs from responsible parties as a condition of federal funding. However, to sue on behalf of another requires special authority in Louisiana. La. C.C.P. art. 694. DOTD's authority to sue to recover the 90% of remediation costs paid to DOTD by FHWA was made an issue early on. Yet, DOTD supplied no evidence containing any special authorization from FHWA enabling DOTD to sue on its behalf to recover the federally paid clean-up costs. The logical place for FHWA to have given such an authorization was in the project agreement itself. Failing that, DOTD should have obtained FHWA's special authorization when they entered into the service contract.
This record shows that during all phases of the highway construction, DOTD paid 100% of the costs and was then reimbursed by the FHWA for 90% of the costs paid by the state. Unfortunately and regrettably, during the long course of this litigation, DOTD did not obtain and did not place in this record, sufficient evidence to show that FHWA specifically authorized DOTD to bring this suit on behalf of FHWA to recover the federal portion of the remediation costs.
Under any of its continually evolving and alternative arguments, DOTD is not entitled to recover the remediation costs paid by FHWA to DOTD. If the money paid by FHWA belonged to FHWA, then DOTD cannot recover because the state has failed to show that FHWA authorized DOTD to bring suit on its behalf. DOTD had ample notice of defendants' claims that DOTD had no standing and no authority to bring suit on behalf of FHWA and provided no evidence establishing its specific authority.
If the money paid by FHWA to DOTD for the federal portion of the remediation costs under the contractual arrangement between the federal and state governments belonged to DOTD, then DOTD cannot recover from the defendants because such a recovery would constitute a double recovery of funds for which it had previously been reimbursed by FHWA.
DOTD's assertions that defendants must make DOTD whole by replacing the federal clean-up funds which could have been used on other projects were unsupported and speculative. The record showed that multiple changes over many years in costs of an interstate highway construction project were the normal, expected occurrence and the cost of a project was often unknown until long after the project was complete.
Our de novo review of this entire record including the documents supplied by DOTD in connection with its Motion for New Trial revealed that the trial court *465 properly granted defendants' Motion for Partial Summary Judgment.

DECREE
For the foregoing reasons, the Partial Summary Judgment in favor of defendants is AFFIRMED. To the extent permissible under law, costs of these proceedings are to be paid by DOTD. The appellate costs are $191.50. The matter is remanded to the trial court for further proceedings, including the calculation of costs, if any, as required by La. R.S. 13:5112.
NOTES
[1] The trial court designated the partial summary judgment as a final judgment for purposes of an immediate appeal.
[2] Crystal's previous MSJs dealt with other issues and were denied by the trial court in a ruling signed by the trial court on October 12, 2000 and a judgment signed November 14, 2000.
[3] C.C. art. 2298 states: A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.

The amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less.
The extent of the enrichment or impoverishment is measured as of the time the suit is brought or, according to the circumstances, as of the time the judgment is rendered.
[4] We distinguish Woodward v. Tadlock, 621 So.2d 875, (La.App. 3rd Cir.1993), writ denied, 629 So.2d 392 (La.1993). In 1996 and again in 1997, La. C.C.P. art 1915 was amended. The present version specifically provides for properly designated appeals from grants of partial summary judgments or sustainings of partial exceptions.